**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MARY MILLER,<br><br>              Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC., *et al*.,<br><br>              Defendants. | Civil No.:  09-02728 (PJS/RLE)<br><br>**DEFENDANT LEXISNEXIS RISK<br>& INFORMATION ANALYTICS<br>GROUP INC.'S MEMORANDUM<br>IN SUPPORT OF MOTION FOR<br>SUMMARY JUDGMENT** |

**INTRODUCTION**

Plaintiff Mary Miller's complaint centers on the allegation that credit bureaus prepared credit reports about her that contained errors.  The alleged errors included a civil judgment erroneously associated with plaintiff along with several "charged off" accounts belonging to a different Mary Miller.

This motion does not concern the credit bureaus' liability, if any, for preparing or for failing to correct an erroneous credit report.  It concerns, instead, whether plaintiff has a claim under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"), against defendant LexisNexis Risk & Information Analytics Group Inc. ("LNRIAG").

LNRIAG was engaged by various credit bureaus as a vendor to retrieve information about the challenged public records the bureaus thereafter decided related to plaintiff and as a result chose to include in plaintiff's credit reports.  Plaintiff's claim against LNRIAG turns on whether LNRIAG is a "furnisher of information" under the

FCRA.  Her claim fails as a matter of law because a "furnisher of information" is limited to an individual who conveys information "relating to a consumer" — and more specifically information *about that person's transactions or experiences with a consumer* — to a consumer reporting agency.  LNRIAG reports only information regarding public records.  LNRIAG does not represent that any record relates to any particular consumer.  Rather, information regarding a public record is "related to" consumers only by credit bureaus when they match a record to a specific individual.  Furthermore, LNRIAG conveys no information about its transactions or experiences with consumers, as it has no such interactions.

Because LNRIAG is not a "furnisher of information" under the FCRA, LNRIAG is entitled to summary judgment.

## GENERAL BACKGROUND

### A.      How a Credit Bureau Prepares a Report.

Credit bureaus prepare credit reports about individual consumers, including in those reports information about debts presently or formerly owed by the consumer and about the consumer's current and historical payment performance with respect to those debts.  (*See* Johnson Decl., Ex. A (Fed. Trade Comm'n ("FTC"), Fed. Reserve Sys., *Report to Congress on the Fair Credit Reporting Act Dispute Process* (Aug. 2006) ("FCRA Dispute Report")) at 5.)  In the language of the FCRA, credit bureaus are "consumer reporting agencies," or "CRAs."  15 U.S.C. § 1681a(f).  The majority of credit report items are accounts that the consumer has opened with a lender: credit cards, automobile or other installment loans, or mortgages.  These lenders supply information

about their transactions or experiences with the consumer on those accounts to the credit bureaus for inclusion in the consumer's report.  (*See* Centanni Decl. ¶ 3; Fluellen Decl. ¶ 6; Stockdale Decl. ¶¶ 6-7.)

In addition to these accounts, credit reports also include information about civil judgments and tax liens, as this information may reflect on an individual's debt levels and debt payment behavior.  (*See* Centanni Decl. ¶ 6; Fluellen Decl. ¶ 5; Stockdale Decl. ¶ 7.) Hence, where the credit bureau can associate (or "match") a civil judgment or a tax lien with a consumer, the bureau will include information about that judgment or lien in credit reports that the bureau prepares about that consumer.  (Centanni Decl. ¶¶ 4, 6 ; Fluellen Decl. ¶ 7; DeGrace Decl. ¶ 4; Stockdale Decl. ¶ 9.)

Unlike consumer accounts information, judgment and lien information is not regularly supplied to credit bureaus by entities that are themselves the prime users of credit reports.  (Centanni Decl. ¶ 6; DeGrace Decl. ¶ 5; Stockdale Decl. ¶ 7); *see also* FCRA Dispute Report at 5.  Civil judgment and tax lien information is made public and is updated in thousands of different courthouses and clerks' offices across the country, by different means, in different formats and at different time intervals.  (*See* Johnson Decl. ¶ 9); *see also* FCRA Dispute Report at 5.  This information is not "pushed" to credit bureaus as is, say, a monthly upload from Capital One containing current information on twenty million specific consumers and their active credit card accounts.  (*See* Centanni Decl. ¶ 6; Stockdale Decl. ¶ 7); *see also* FCRA Dispute Report at 5.  If a credit bureau wants to include civil judgment and tax lien information in the credit reports it compiles on consumers, the credit bureau either has to go collect the data, or contract with

someone else to do so.  (Johnson Decl. ¶ 15; Stockdale Decl. ¶ 7.)  Hypothetically the bureaus could have engaged UPS or FedEx to pick up information and deliver it to them; but here their vendor was LNRIAG.

### B.    LNRIAG.

Until January 1, 2010, LNRIAG's public records collection division was one of a number of public records information vendors that collect select information from the courts about liens, judgments and bankruptcy filings and provide such information to credit bureaus such as Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian") and Trans Union, LLC ("Trans Union").[1] (Johnson Decl. ¶¶ 2-5.)  Each subscribing credit bureau then evaluates whether they can "match" the public record to a consumer on whom the bureau maintains a credit file. (*Id.*, ¶ 13; Centanni Decl. ¶¶ 4, 6; Fluellen Decl. ¶ 7; Stockdale Decl. ¶ 9.)  LNRIAG also provided a second service to credit bureaus:  where a consumer disputed with the credit bureau information about a public record item in his or her credit report, LNRIAG, on request of the credit bureau, would "re-collect" information about the specific public record in dispute and report information about that public record's current status to the credit bureau.  (Johnson Decl. ¶¶ 16-17; Centanni Decl. ¶ 7; Fluellen Decl. ¶¶ 12-14; Stockdale Decl. ¶ 14.)  This process of "re-collecting" a public record's status in connection with a dispute by a consumer is referred to as the "consumer dispute

---

[1]      Since January 1, 2010, LNRIAG's public records collection functions have been performed by a different entity, LexisNexis Risk Data Retrieval Services, LLC ("RDRS").

verification" or "CDV" process.  (Johnson Decl. ¶¶16-18; Centanni Decl. ¶ 7; Fluellen

Decl. ¶¶ 12-14; Stockdale Decl. ¶¶ 12-14.)

## LEGAL FRAMEWORK

**A.    Courts Recognize that FCRA "Furnishers" Are Those Entities That
Report To CRAs Information About Their Transactions or
Experiences With Specific Consumers.**

15 U.S.C. Section 1681s-2 imposes certain obligations on "furnishers of

information" to CRAs.  Courts construing that section recognize that to be liable as a

"furnisher" of information under the FCRA, a person must convey information to

consumer reporting agencies about that person's transactions or experiences with a

consumer.  Some courts reach this conclusion after finding that the FCRA explicitly

defines the term "furnisher" to include only those with a direct consumer relationship:

"A furnisher is defined as a person who 'regularly and in the ordinary course of business

furnishes information to one or more consumer reporting agencies about the person's

transactions or experiences with any consumer.'"  *See Smith v. Indiana Mut. Credit Assn.*,

No. 05-238, 2007 U.S. Dist. LEXIS 18924, at *6-7 (S.D. Ind. Mar. 15, 2007) (citing

15 U.S.C. § 1681s-2(a)(2)); *see also Downie v. Revco Discount Drug Ctrs., Inc.*, No. 05-

00021, 2006 U.S. Dist. LEXIS 41434, at *27-28 (W.D. Va. Jun. 19, 2006) (same);

*Ayers v. Equifax Info. Servs.*, No. 03-551, 2003 U.S. Dist. LEXIS 23271, at *2 n.1 (E.D.

Va. Dec. 16, 2003) (same).

Other courts, while assuming that the FCRA does not explicitly define the term

"furnisher," agree that the term refers to those with direct consumer relationships.  *See*

*Kibbie v. BP/Citibank*, No. 08-1804, 2009 U.S. Dist. LEXIS 81806, at *18 (M.D. Pa.

Sept. 9, 2009) ("Although the FCRA does not define 'furnishers of information' it is 'generally understood to include various types of creditors, such as banks and other lenders, that provide credit information *about their customers* to other entities that issue consumer reports about the customers' credit worthiness.'") (citing *Ross v. Washington Mut. Bank*, 566 F. Supp. 2d 468, 475 n.1 (E.D.N.C. 2008) (emphasis added)); *Ransom v. Equifax, Inc*., No. 09-80280, 2010 U.S. Dist. LEXIS 30886, at *10-11 (S.D. Fla. Mar. 30, 2010) (same); *Saunders v. Equifax Info. Servs., LLC*, No. 05-731, 2006 U.S. Dist. LEXIS 71976, at *2-3 (E.D. Va. Oct. 3, 2006) ("Although 'furnisher' is not defined in the [FCRA], the term is understood as including any entity . . . *that provides information about its customers* to [CRAs] including information about a customer's payments on their accounts.") (citing FCRA Dispute Report at 4) (emphasis added)).

Courts also interpret the term furnisher to apply only to "an entity which transmits *information concerning a particular debt owed by a particular customer* to consumer reporting agencies."  *See Barkho v. Homecomings Fin., LLC*, 657 F. Supp. 2d 857, 864 (E.D. Mich. 2009) (quotation omitted and emphasis added); *see also Chiang v. MBNA*, 634 F. Supp. 2d 164, 167 (D. Mass. 2009) (same); *Wade v. Equifax*, No. 02 C 3205, 2003 U.S. Dist. LEXIS 15686, at *5-6 (N.D. Ill. Aug. 29, 2003) (same) (citing *DiMezza v. First USA Bank, Inc.*, 103 F. Supp. 2d 1296, 1299 (D.N.M. 2000)); *Carney v. Experian Info. Sols. Inc.*, 57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999) (same).

The courts' interpretation of the term "furnisher" to mean an entity that provides information about its direct accounts, experiences and transactions with consumers

comports with the appropriate agencies' interpretations and with the FCRA's legislative history and industry practice.

**B.     The Agencies Charged With Implementing the FCRA Interpret "Furnisher" to Refer to An Entities With A Consumer Relationship — And the Agencies' Interpretation is Entitled to Chevron-Deference.**

In enacting the FCRA, Congress mandated that the Federal Trade Commission, the Federal banking agencies, and the National Credit Union Administration ("NCUA") be vested with regulatory authority over furnishers of information to consumer reporting agencies and "prescribe such regulations as necessary to carry out the [FCRA]." 15 U.S.C. § 1681s(e).  These agencies both in their FCRA-mandated regulations and congressional reports, recognize that "furnishers" are entities that report to CRAs regarding the entities' direct consumer relationships.  *See* 16 C.F.R. § 660.2(a),(e) (promulgating regulations effective July 1, 2010); *see also* FCRA Dispute Report at 4.

The regulations define "furnisher" as "an entity that furnishes information *relating to consumers* to one or more [CRAs] for inclusion in a consumer report."  16 CFR § 660.2(c) (emphasis added).  Additionally, the FTC recognizes that "[a]s the term is generally understood . . . furnishers are entities that provide *information about their customers* to CRAs."  *See* FCRA Dispute Report at 4 (emphasis added).  By contrast, recognizing that public records vendors are not "furnishers" and are distinct from the types of entities that report information about their customers, the FTC refers to public records vendors *not* as "furnishers" but as "*hire[d] contractors*" that "*gather information.*"  *See id.* at 5 (emphasis added).

Similarly, the federal banking agencies, FTC and NCUA's rules regarding direct consumer disputes acknowledge that "furnishers" are limited to those entities that have a relationship with the consumer in requiring an investigation of a dispute received directly from a consumer if it relates to information about an account, debt, or other relationship between the furnisher and the consumer.  *See* 16 CFR 660.4(a)(1)-(4); *see also* 12 CFR parts 41, 222, 334, 571, and 717 at §§ .43(a)(1)-(4).  Explaining their rationale for the rule, the banking agencies, NCUA and FTC stated that they "believe that a furnisher should be responsible for investigating disputes only about information *regarding an account or other relationship between the furnisher and the consumer*."  Fair and Accurate Credit Transactions Act, 74 Fed. Reg. 31,484, 31,498 (July 1, 2009) (to be codified at Section 312) (emphasis added).  Indeed, entities that supply public record information to credit bureaus and which do not have "*an account or other relationship with the consumer*" are *expressly exempted* from regulations requiring "reasonable investigations" of disputed information in a consumer report.  *See* 16 CFR 660.4(b)(1)(iv); *see also* 12 CFR parts 41, 222, 334, 571, and 717 at §§ .43(b)(1)(iv).

Moreover, the FTC's standards of "accuracy and integrity" for information furnished to consumer reporting agencies (*see* 15 U.S.C. § 1681s-2(e)), also make clear that "furnished" information within the meaning of the FCRA is information about the providing entity's direct transactions with a consumer:

> (a) Accuracy means that information that a furnisher provides to a consumer reporting agency *about an account or other relationship with the consumer* correctly:  (1) Reflects the terms of and liability for the account or other *relationship*; (2) Reflects the consumer's performance and other conduct

> *with respect to the account or other relationship*; and (3) Identifies the appropriate consumer.
>
> . . .
>
> (e) Integrity means that information that a furnisher provides to a consumer reporting agency *about an account or other relationship with the consumer*:  (1) Is *substantiated by the furnisher's records* at the time it is furnished; (2) Is furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report; and (3) *Includes the information in the furnisher's possession about the account or other relationship* . . . .

*See* 16 C.F.R. § 660.2(a),(e) (emphasis added).

As "the federal agency empowered by Congress to administer and enforce [the FCRA]," the FTC's interpretation of the FCRA, particularly when issued after "public hearings called to reconcile various policy considerations," is entitled to *Chevron* deference.  *See Yonter v. Aetna Finance Co.*, 777 F. Supp. 490, 492 (E.D. La. 1991) (citing *Chevron v. NRDC*, 467 U.S. 837, 843 (1984)).  In applying *Chevron* deference, "a court need not conclude that an agency's construction of a statute that it administers was the only permissible one, or that the court would have reached a different conclusion. The reviewing court need only find that the agency's construction is one permissible reading of the statute."  *See id.* at 492-93 (granting summary judgment to defendants in FCRA action brought by consumer).  Here, the FTC's construction of the term "furnisher" as applying only to entities reporting on their direct relationships with consumers is permissible as supported by the FCRA, numerous courts, and (as set forth below) industry practice.  *See id.* at 493 ("[L]ongstanding agency interpretation,

Congressional acquiescence, widespread industry practice and, as the defendant respectfully asserts in his brief, 'common sense'" mandated summary judgment for the defendant on FCRA claims).

> **C.     The Statute's Structure and Legislative History Make Clear that An FCRA "Furnisher" Is An Entity That Has Direct Relationships With Consumers and Furnishes Information About Specific Consumers.**
>
> > **1.     The FCRA's legislative history makes clear that a "furnisher" must have a relationship with the consumer.**

"Furnisher" obligations were added to the FCRA in 1996.  *See* P.L. 104-208 at § 2413 (1996), codified at 15 U.S.C. § 1681s-2.  The legislative history of the furnisher obligations indicates that an entity is a "furnisher" under the FCRA only if it provides to a consumer reporting agency information about its own transactions with a consumer.[2]

The legislative history makes clear that Congress intended to target creditors and others with a direct relationship with the consumer on whom they were reporting information:  "The expansion of the FCRA's coverage makes particular sense because it is creditors and other furnishers of information, not consumer reporting agencies, that have *direct access to the facts of a given credit transaction*.  Ordinarily, the creditor is best situated to determine whether the information it reported was inaccurate or

---

[2]     Although the final version of the legislation amending the FCRA was enacted without any Committee or Conference reports, the furnisher provisions as enacted are substantially identical to provisions contained in an earlier version of the legislation.  *See* S. Rep. 103-209 at 24 (1993) (favorably reporting to the full Senate legislation containing furnisher liability provisions that are substantially identical to those eventually enacted into law); *see also Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 35 (1st Cir. 2010) (construing 1996 amendments to the FCRA's furnisher provisions by reference to S. Rep. No. 103-209, at 6 (1993)).

incomplete and to ensure its correction." *See* S. Rep. 103-209 at 6 (quoting with approval the testimony of the FTC's Director of Credit Practices) (emphasis added).

The congressional Record for the 1996 amendments adopting the "furnisher" provisions is likewise replete with FTC testimony and sponsoring Senators' and Representatives' statements that the "furnishers of information" targeted by the FCRA are "*the retailers, credit card companies, and mortgage companies*" (*see, e.g.*, 140 Cong. Rec. S4974 (daily ed. May 2, 1994) (statement of Sen. Bryan) (emphasis added)) and other "*creditors . . . who have direct access to the facts of a given transaction* and [are] best situated to correct inaccuracies." *See, e.g.*, *Amendments to the Fair Credit Reporting Act: Hearing Before the Subcomm. on Consumer Affairs and Coinage of the Comm. on Banking, Fin. and Urban Affairs, H.R.*, 101st Cong. 11-12 (June 12, 1990) (statement of Jean Noonan, Assoc. Dir. for Credit Practices, FTC) (emphasis added). Numerous legislators underscored that the legislation targeted creditors "like finance companies and department stores," and other companies *with whom consumers hold accounts* as the "furnishers" to be covered by the FCRA. *See e.g., Hearing Before the Subcomm. on Consumer Credit and Ins. of the Comm. on Banking, Fin. and Urban Affairs, H.R.*, 103rd Cong. 2 (Oct. 20, 1993) (statement of Chairman Kennedy) (emphasis added).[3]

---

[3]      *See also* 141 Cong. Rec. S5450 (daily ed. Apr. 6, 1995) (statement of Sen. Bond) ("[O]ur bill gives the consumer the right to sue the *creditor* who will not fix the information it submitted to the credit bureau.") (emphasis added); 136 Cong. Rec. S8391 (daily ed. June 20, 1990) (statement of Sen. Cranston) ("An example of persons likely to be covered by [furnisher] provisions would be *creditors with whom the consumer maintains an account*.") (emphasis added); 140 Cong. Rec. H9814 (daily ed. Sept. 27, 1994) (statement of Rep. Flake) ("[This] legislation that holds *banks and retailers* accountable for information they provide to credit reporting agencies.") (emphasis added); 140 Cong. Rec. H9812 (daily ed. Sept. 27, 1994) (statement of Rep. Torres)

By contrast, there is no indication in the legislative history that the FCRA was meant to extend to public records vendors, like LNRIAG here, as "furnishers" of information.  Indeed, on the rare occasions when public records vendors were mentioned at all, it was in the context of distinguishing public records vendors from "furnishers" such as "creditors," and urging legislation to require the *credit bureaus* to keep public record information up to date.  *See, e.g., Hearing Before the Subcomm. on Consumer Affairs and Coinage of the Comm. on Banking, Fin. and Urban Affairs, H.R.*, 102nd Congress 4, at 129 (Oct. 24, 1991) (testimony of Elgie Holstein, Exec. Dir., BankCard Holders of America) ("urg[ing] the subcommittee to consider a provision requiring credit bureaus to promptly update public record information (records of bankruptcy, judgments and suits, for example) in consumer credit files.  *Since public record information is routinely supplied to credit bureaus by subcontractors who gather the information from town halls and courthouse records, there is rarely a "user" that reports updates, as in the case of credit grantors that report information routinel*y.") (emphasis added).

---

(continued…)

(same); 136 Cong. Rec. E2556 (daily ed. July 31, 1990) (statement of Rep. Lehman). ("[The bill] require[s] persons who furnish information to reporting agencies – *creditors* and others – to establish procedures to assure the maximum possible accuracy of the information they furnish, and to alert consumers to the fact that they furnish *information about their customers* to reporting agencies.") (emphasis added).

## 2. The structure of the statute indicates that "furnishers" must have a relationship with the consumer.

The statute itself is consistent with this legislative intent.  For instance, many of the obligations of furnishers expressly apply only to entities that have a customer relationship with the furnisher.  For example:

- the requirement in Section 1681s-2(a)(2) that furnishers correct and update information provided to consumer reporting agencies applies only to information "about [a furnisher's] transactions or experiences with [the] consumer;"

- the requirement in Section 1681s-2(a)(4) that furnishers notify consumer reporting agencies where the consumer has voluntarily closed his or her account applies only to credit accounts maintained by the furnisher; and

- the requirement in Section 1681s-2(a)(7) that furnishers notify consumers before reporting negative information to a consumer reporting agency applies only to lenders "furnish[ing] negative information . . . regarding credit extended to a customer."

Other furnisher obligations also demonstrate that the furnisher will have a direct relationship with the consumer about whom it is reporting.  For example, perhaps the most important furnisher obligation — and the only duty that permits a private right of action — is the requirement that furnishers investigate information that they have provided to a consumer reporting agency, that the consumer reporting agency has included in a consumer report, and that the consumer disputes with the consumer reporting agency.  *See* 15 U.S.C. § 1681s-2(b).  The requirement that furnishers investigate disputes was added to the FCRA precisely because furnishers "have direct

access to the facts of a given . . . transaction." S. Rep. 103-209 at 6. In other words, as a party to the transaction, a "furnisher" has knowledge of the underlying transaction that would not be available to the consumer reporting agency or to any other person.

The fact that most FCRA furnisher obligations, as well as the Agencies' rules contemplate that "furnishers" will have direct relationships with consumers demonstrates that Congress never intended that a public records data vendor such as LNRIAG — who has no such relationships with consumers — should be considered a furnisher under the FCRA.

## FACTUAL FRAMEWORK

### A.      LNRIAG's Bulk Public Records Collection Business.

Until January 1, 2010, LNRIAG was one of a number of public records information vendors that collect select information from the courts about liens, judgments and bankruptcy filings and provide that information about public records to credit bureaus such as Equifax, Experian and Trans Union. (*See* Johnson Decl. ¶¶ 2-4; Centanni Decl. ¶ 6; Fluellen Decl. ¶ 7; Stockdale Decl. ¶ 8.)

LNRIAG predominantly collected public records information through independent contractors who reviewed court or other public records via various public access points such as public offices or on-line. (Johnson Decl. ¶¶ 7-9.) Using laptop computers equipped with LNRIAG's proprietary software, the independent contractors collected selected data on these public records. (*Id.* ¶ 9.) The collected information included the case number, record type, originating court or office, date of the record, dollar amount of the obligation (if any), and the names and addresses shown in the public record as

associated with the proceeding. (*Id.* ¶ 11.)  LNRIAG arranged the collected information in formats specified by its subscribers and transmitted the data to those subscribers as frequently as was specified in the subscriber's contract. (*Id.* ¶ 12.)

LNRIAG made no attempt to associate public record information with particular consumers. (*Id.* ¶¶ 13-14.)  LNRIAG's database had no files that purported to be "about" a specific consumer:  the system could not provide, for example, "all public records relating to John Q. Smith, residing at 123 Main St., Anytown, MN." (*Id.*)  LNRIAG did not associate with any public record any sort of identifier intended to indicate to which specific consumer with the name reflected in the public record that record related. (*Id.* ¶ 14)  Nor did LNRIAG's database make or reflect any linkages between public record information arising from different court or tax lien proceedings to the effect that, for example, the same person was the debtor or the defendant in each proceeding. (*Id.* ¶¶ 13-14.)

When it provided public record data to the CRAs, LNRIAG made no representation to the CRAs as to the identity of any individual to whom any public record data related. (*Id.* ¶¶ 13, 24.)  The CRAs understand that in transmitting information about public records, LNRIAG was not relating such information to specific consumers; that LNRIAG was transmitting information only about records. (Centanni Decl. ¶¶ 9-10, 12; Fluellen Decl. ¶¶ 7, 17; DeGrace Decl. ¶ 8; Stockdale Decl. ¶ 10.)

If a credit bureau believes that it can identify the consumer to whom the public record information relates, the credit bureaus place that information in the file the credit bureaus maintain regarding the consumer, and include that information in credit reports

they prepare about that consumer.  (Centanni Decl. ¶¶ 4, 6; Fluellen Decl. ¶ 7; DeGrace Decl. ¶¶ 4, 8; Stockdale Decl. ¶ 9.)  The credit bureaus' decisions about whether to include information about a given public record in a particular consumer's credit file are entirely their own; the bureaus neither solicited nor accepted advice or recommendations from LNRIAG as to the "matching" of public records to consumers.  (Stockdale Decl. ¶ 10; Centanni Decl. ¶¶ 9-10; Fluellen Decl. ¶ 7, 17; *see also* Johnson Decl. ¶¶ 25-26.) LNRIAG did not have access to the credit bureaus' proprietary "matching" logic. (Johnson Decl. ¶ 13.)

B.     **LNRIAG's On-Demand Verifications for the Credit Bureaus.**

Each credit bureau provides a mechanism whereby consumers about whom the bureau has prepared a credit report can dispute the accuracy of information in the report. (*See* Johnson Decl. ¶¶ 16-19; Centanni Decl. ¶ 7; Fluellen Decl. ¶¶ 12-14; Stockdale Decl. ¶ 12.)  If the consumer's dispute concerns an item from an entity that provides information to the bureau about its transactions or experiences with a consumer (e.g., "I've paid that credit card off, but my credit report says I still owe $2,000"), the credit bureau must route the dispute to the entity that provided the account information (e.g., the credit card issuer) through an automated, web-based clearinghouse called "e-OSCAR." *See* 15 U.S.C. § 1681i(a)(5)(D) (requiring consumer reporting agencies to implement an automated reinvestigation system through which furnishers of information may report the results of reinvestigations).  The credit bureaus did not use "e-OSCAR" to convey consumer dispute verification or "CDV" requests to LNRIAG, and LNRIAG did not use

e-OSCAR to transmit results of any CDVs back to the credit bureaus.  (*See* Johnson Decl. ¶ 34; Centanni Decl. ¶ 13(c); Fluellen Decl. ¶ 23; Stockdale Decl. ¶ 20.)

When a consumer's dispute relates to public record information that the credit bureau has included in a credit report about the consumer, the credit bureaus do not ensure that the associated CDV is sent to the public records vendor that initially provided information about the record to the credit bureau.  (*See* Centanni Decl. ¶ 13(a); Fluellen Decl. ¶ 21; Stockdale Decl. ¶ 18; Johnson Decl. ¶¶ 30-32.)  Instead, where a consumer's dispute with a credit bureau relates to a lien, judgment or bankruptcy filing, the credit bureau generally turns to the outside vendor that currently collects new public record data in the jurisdiction in which the record originated and asks that vendor to retrieve updated information about the public record in question.  (*See* Centanni Decl. ¶ 13(a); Fluellen Decl. ¶ 21; Stockdale Decl. ¶ 18; Johnson Decl. ¶¶ 30-32.)  As noted above, this process is referred to as a "consumer dispute verification," or "CDV."

In the CDV process, the credit bureau provides to the vendor identifying information about a disputed record, such as the court, case number and file type.  (Johnson Decl. ¶ 18; Centanni Decl. ¶ 4, 7; Fluellen Decl. ¶ 13; DeGrace Decl. ¶ 7; Stockdale Decl. ¶ 13.)  The vendor "re-collects" current information about the public record from the appropriate court or government office, and transmits the information about the public record's current status to the credit bureau.  (Johnson Decl. ¶¶ 21-23; Centanni Decl. ¶ 7; Fluellen Decl. ¶ 13; DeGrace Decl. ¶ 7.)  The credit bureau then decides, based on its own analysis of the CDV results and the information in its databases about the consumer, whether the credit bureau will continue to "match" the disputed

record to that specific consumer.  (*See* Centanni Decl. ¶ 9; Fluellen Decl. ¶¶ 7, 17;

Stockdale Decl. ¶ 16.)

      For example, during the CDV process, the public records vendor may discover

that a judgment disputed by a consumer, and originally supplied to the credit bureau as

unsatisfied, is shown in the current public record as satisfied.  The vendor transmits the

current status of the record (satisfied) to the credit bureau.  (Johnson Decl. ¶ 22.)

Another example is where the consumer's dispute is that the record included in the credit

report does not relate to him.  If the consumer name supplied by the credit bureau was

"John R. Smith," but the name on the judgment is "John Smith," the vendor would

simply report the current information in the record, i.e., that the name on the judgment is

"John Smith."  (*See id.*)  Having received current information about the public record, the

credit bureau may then update its own records and may modify the credit reports it

prepares about the consumer.  (Centanni Decl. ¶ 9; Fluellen Decl. ¶ 17; Stockdale Decl.

¶ 16.)  Or, the credit bureau might determine, based on discrepancies between the

spelling of the consumer's name and the name on the judgment or based on other

information provided by the consumer to the credit bureau, that the credit bureau should

delete that judgment from the consumer's file.  (Centanni Decl. ¶¶ 9, 14; Fluellen Decl.

¶ 17; Stockdale Decl. ¶¶ 14-16.)

      In conveying up-to-date information about public records to the credit bureaus as

part of the CDV process, LNRIAG did not make any representations or draw any

conclusions as to whether the credit bureaus' determination that a record is associated

with a particular consumer was correct:  in other words, that the credit bureau properly

"matched" the record to the consumer at issue.  (Johnson Decl. ¶¶ 13, 25-26; Centanni

Decl. ¶¶ 9-10; Fluellen Decl. ¶ 7, 17; Stockdale Decl. ¶ 16.)  The credit bureaus, in turn,

did not take any information LNRIAG transmitted to them as conclusive regarding

whether a particular record should be matched with a particular consumer.  (Johnson

Decl. ¶¶ 13, 25-26; Centanni Decl. ¶¶ 9-10, 13-14; Fluellen Decl. ¶ 7, 17; Stockdale Decl.

¶ 16.)  The bureaus neither solicited nor accepted advice or recommendations from

LNRIAG as to whether the bureau's matching of a public record to the disputing

consumer was correct or not.  (Johnson Decl. ¶¶ 13-14, 25-26; Centanni Decl. ¶¶ 9-10,

13-14; Fluellen Decl. ¶ 7, 17; Stockdale Decl. ¶ 16.)  LNRIAG could not instruct a credit

bureau to delete a public record from the credit file maintained by the credit bureau with

respect to a consumer.  (Johnson Decl. ¶¶ 13-14, 24-26; Centanni Decl. ¶¶ 9-10, 13-14;

Fluellen Decl. ¶ 7, 17; Stockdale Decl. ¶ 16.)  Like the decision to associate a record with

a particular consumer in the first instance, the credit bureaus' decision to modify or delete

information about a record in the credit bureaus' files on a particular consumer is entirely

their own.  (Johnson Decl. ¶¶ 13-14, 24-26; Centanni Decl. ¶¶ 9-10, 13-14; Fluellen Decl.

¶ 7, 17; Stockdale Decl. ¶ 16.)

    **C.**    **The Industry Did Not Treat LNRIAG as an FCRA "Furnisher."**

The credit bureaus did not treat LNRIAG as a "furnisher" of consumer credit

information under the FCRA.  (Centanni Decl. ¶¶ 11-13; Fluellen Decl. ¶ 20; DeGrace

Decl. ¶ 8-9; Stockdale Decl. ¶¶ 17-22; Johnson Decl. ¶¶ 28.)  Among other things, the

credit bureaus generally did not provide LNRIAG with notices required to be provided to

information "furnishers" under the FCRA.  (*See* Johnson Decl. ¶ 28, 35.)  For example,

when a consumer informs the credit bureaus that an item (most frequently a credit card account) reported in the consumer's credit reports was opened by an unauthorized person in an identity theft, the credit bureaus are required to notify the "furnisher" of the item that the consumer claims she was the victim of identity theft.  *See* 15 U.S.C. § 1681c-2; (*see also* Johnson Decl. ¶ 35; Centanni Decl. ¶ 13(d).)  Where the item is a public record that LNRIAG had provided to the credit bureaus, the credit bureaus did not provide any such notice to LNRIAG.  (*See* Johnson Decl. ¶ 35; Centanni Decl. ¶ 13(d).)

Numerous other indicators demonstrate that the credit bureaus rightly did not consider LNRIAG a "furnisher."  Whereas the credit bureaus always route disputes to the creditor or other furnisher that maintains the disputed account in question, the credit bureaus did not necessarily route all disputes about public record information initially collected by LNRIAG back to LNRIAG for re-investigation.  Rather, disputes about public record information are generally routed to the then-current public records vendor for a particular region, regardless of whether a different vendor (or the credit bureau itself) initially collected the disputed public record information.  (Centanni Decl. ¶ 13(a); Fluellen Decl. ¶ 21; Stockdale Decl. ¶ 18; Johnson Decl. ¶¶ 30-32.)

The credit bureaus paid LNRIAG to collect and re-investigate information; they do not pay "furnishers of information" such as creditors, to investigate disputed account information.  (*See* Centanni Decl. ¶ 13(b); Fluellen Decl. ¶ 22; Stockdale Decl. ¶ 19.) The credit bureaus use e-OSCAR, an FCRA-mandated online dispute clearinghouse, to process disputes relating to account information supplied by "furnishers of information"

— they do not use e-OSCAR to convey investigation requests to LNRIAG.  (*See* Centanni Decl. ¶ 13(c); Fluellen Decl. ¶ 23; Stockdale Decl. ¶ 20.)

Finally, the credit bureaus neither requested nor expected that LNRIAG "block" or "delete" any public record information (as the creditor would expect a creditor "furnisher" to do regarding disputed account information).  (*See* Centanni Decl. ¶¶ 13(e)-14; Stockdale Decl. ¶¶ 16, 22.)  Instead, where the credit bureaus determine that public record information was incorrectly associated by them with the wrong individual, the credit bureaus themselves use computer codes to "cloak" or suppress the public record information in their systems in relation to the individual with whom it should not have been associated.  (*See* Centanni Decl. ¶¶ 13(e)-14.)

The credit bureaus' treatment of LNRIAG comports with industry understanding that LNRIAG is not a "furnisher" of information under the FCRA.  Industry observers, such as the Electronic Privacy Information Center, a watchdog group dedicated to monitoring privacy aspects of the credit industry, likewise recognize that public records vendors such as LNRIAG are merely "sub-vendors" that, at the credit bureaus' behest, "supply them with information from public records."  *See Legislative Hearing on H.R. 2622, The Fair and Accurate Credit Transactions Act of 2003, Before the H. Comm. on Fin. Servs.*, 108th Cong. (2003) (Testimony and Statement for the Record of Chris Hoofnagle, Deputy Counsel, Elec. Privacy Info. Ctr.), *available at* http://epic.org/privacy/fcra/2622testimony.html.  Industry observers also recognize that the credit bureaus, not the public records vendors, determine whether a particular record relates to a particular individual.  *See id.* ("These public records usually do not have

uniquely identifiable information, and as a result, CRAs may attribute incorrect information to individuals.").

Even the financial services industry's plaintiff's bar recognizes the distinction between "furnishers" on the one hand and public records vendors such as LNRIAG on the other.  (*See, e.g.*, Leonard Bennett, "Bankruptcy and Public Records," Nat'l Assoc. of Consumer Advocates (2006), *available at* http://ltclg.com/images/lenbankruptcy.pdf.) As a paper presented to the National Association of Consumer Advocates observes, "It is important to understand the differences, as well as the similarities, between [Public Records information] cases and those involving creditor-furnishers." (*Id.* at 2.)  Among the easily identifiable "differences" are:  credit reports reserve separate sections for creditor-furnisher supplied or "tradeline" information versus public records information; credit accounts are "reported" to the credit bureaus "by their customer subscribers — banks, mortgage companies, auto lenders and others," while public records information is gathered by vendors "according to the instructions of the [credit bureaus]"; and credit bureaus take a "passive" role in receiving credit information from furnishers, but an "active" role in "instruct[ing]" the "public records vendors [to] gather the information [the credit bureaus] request." (*Id.* at 2-3.)

As the industry, trade groups and plaintiffs' bar recognize, LNRIAG was merely a contractor for the credit bureaus.  (*See, e.g.,* Centanni Decl. ¶ 6.)  LNRIAG had no relationship of any kind with the individuals whom the credit bureaus have associated with a given public record.  (*See* Centanni Decl. ¶ 13; Fluellen Decl. ¶ 20; DeGrace Decl. ¶ 9; Stockdale Decl. ¶ 17.)  The public record data that LNRIAG transmitted to the credit

bureaus did not relate in any way to LNRIAG's transactions or experiences with any consumer.  (*See id.*; *see also* Johnson Decl. ¶ 27.)  LNRIAG simply acted as a pass-through, collecting and transmitting information from publicly available records. (Johnson Decl. ¶ 15.)  The information LNRIAG provided its subscribers was about records, not about people as contemplated by the FCRA and certainly not about any non-existent transaction or experience LNRIAG has with any consumer.  (*See id.* ¶¶ 13, 27; Centanni Decl. ¶ 13; Fluellen Decl. ¶ 20; DeGrace Decl. ¶ 9; Stockdale Decl. ¶ 10); *see also* 15 U.S.C. § 1681 et seq.  Simply put, LNRIAG is not a "furnisher."

> ### D.    The Plaintiff's Allegations.

Plaintiff alleges that her "credit file" maintained by credit bureaus Experian and CSC contain inaccurate information.  (*See* Compl. ¶ 11 ("Plaintiff's credit history maintained by Defendants CSC and Experian is being mixed or merged with that of someone other than Plaintiff.".)  Plaintiff also alleges that LNRIAG "fail[ed] to appropriately report the results of its investigation, and/or fail[ed] to appropriately modify, delete, or block the adverse state court judgment information."  (*Id.* ¶ 32.)

Plaintiff asserts that LNRIAG violated Section 1681s-2(b) by allegedly failing to conduct the reasonable investigation required of "furnishers" by the FCRA.  (*See* Compl. ¶¶ 32-33; *see also* 15 U.S.C. § 1681s-2(b).)  As shown below, Plaintiff's claim fails as a matter of law since LNRIAG is not a "furnisher" subject to suit under Section 1681s-2.

## ARGUMENT

### A.      Summary Judgment Standard

A party against whom a claim is asserted may, at any time, move for summary

judgment.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate when there is no

genuine issue as to any material fact, and, when viewing the evidence most favorably to

the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine issue of

material fact only exists if sufficient evidence is presented such that a reasonable fact

finder could decide in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Any alleged issue of fact must be

genuine.  "When the moving party has carried its burden under Rule 56(c), its opponent

must do more than simply show that there is some metaphysical doubt as to the material

facts."  *Id.*  Thus, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.* at 587

(citation omitted).

Summary judgment is appropriate where, as here, the nonmoving party fails to

make a sufficient showing on an essential element of his case for which he bears the

burden of proof.  *Celotex*, 477 U.S. at 322-23.  "[I]f a non-moving party cannot support

each essential element of its claim, summary judgment must be granted because a

complete failure of proof regarding an essential element necessarily renders all other facts

immaterial."  *Shannon v. ACS State & Local Sols., Inc.*, No. 08-594, 2008 U.S. Dist.

LEXIS 43368, at *2-3 (D. Minn. May 30, 2008 ) (Doty, J.) (citing *Celotex*, 477 U.S. at

322-23).  To make the requisite showing "the [non-moving] party cannot rest on its pleadings alone" but has the burden of countering the movant's evidence, including affidavit evidence.  *See Beyer v. Firstar Bank N.A.*, 447 F.3d 1106, 1108 (8th Cir. 2006) (affirming grant of summary judgment to defendant on FCRA claims where plaintiff failed to counter affidavit evidence) (citing *Celotex*, 477 U.S. at 324).

Here, summary judgment in LNRIAG's favor is appropriate on plaintiff's FCRA claims because plaintiff cannot demonstrate that LNRIAG is a "furnisher" of information within the meaning of the FCRA.  *See Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 34 (1st Cir. 2010) ("[I]ssues of statutory interpretation" under the FCRA "present . . . pure questions of law."); *see also Houghton v. New Jersey Mfrs. Ins. Co.*, 795 F.2d 1144, 1147 (3d Cir. 1986) (same).

**B.    This Court Should Grant Summary Judgment Because LNRIAG Is Not A "Furnisher" under the FCRA.**

**1.    LNRIAG is not a "furnisher" under the courts' or federal agencies' interpretation of the FCRA.**

Upon a plain reading of the statute, and by reference to the FCRA's "practical point," LNRIAG is not a "furnisher" and is entitled to judgment as a matter of law on plaintiff's FCRA claims.  *See Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 64 (2007) (statutes are to be construed by reference to their plain language and legislative history as well as the "practical point" of the statute and common sense).  As set forth above, the courts and the agencies charged by Congress with enforcing the FCRA agree that a "furnisher" is a "person who 'regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions

or experiences with any consumer.'" *See, e.g., Smith*, 2007 U.S. Dist. LEXIS 18924, at
*6-7 (citing 15 U.S.C. § 1681s-2(a)(2)); see also FCRA Dispute Report at 4 ("furnishers
are *entities that provide information about their customers* to CRAs." (emphasis added)).

Here, LNRIAG had no relationship of any kind with the individual as to whom the
credit bureaus have associated with a given public record.  (Johnson Decl. ¶ 27.)  The
public record information that LNRIAG transmitted to the credit bureaus did not relate in
any way to LNRIAG's transactions or experiences with any consumer.  (*Id.*; *see also*
Centanni Decl. ¶ 13; Fluellen Decl. ¶ 20; DeGrace Decl. ¶ 9; Stockdale Decl. ¶ 17.)
Moreover, here the evidence demonstrates that LNRIAG did not transmit information
about "particular debts" or "particular customers," but only transmitted information in
bulk about public records.  (*See* Johnson Decl. ¶¶ 12-15, 27; Centanni Decl. ¶ 13;
Fluellen Decl. ¶ 20; DeGrace Decl. ¶ 9; Stockdale Decl. ¶¶ 10, 17.)  As a matter of law,
LNRIAG therefore is not a "furnisher" of information within the meaning of the FCRA.
*See, e.g., Barkho*, 657 F. Supp. 2d at 864 (construing "furnisher" as applying to "*an entity
which transmits information concerning a particular debt owed by a particular customer
to consumer reporting agencies.*") (quotation omitted and emphasis added); s*ee also
Smith*, 2007 U.S. Dist. LEXIS 18924, at *6-7 ("A furnisher is defined as a person who
'regularly and in the ordinary course of business furnishes information to one or more
consumer reporting agencies about the person's transactions or experiences with any
consumer.'" (citing 15 U.S.C. § 1681s-2(a)(2))); *Kibbie*, 2009 U.S. Dist. LEXIS 81806,
at *18 ("furnisher of information [] is generally understood to include various types of
creditors, such as banks and other lenders, that provide credit information about their

customers to other entities that issue consumer reports about the customers' credit worthiness.") (quotation omitted).

Indeed, while the FCRA-enforcing agencies consistently construe "furnisher" as applying only to entities with direct consumer relationships, *no* federal regulatory agency statement, report or rulemaking characterizes as a "furnisher" an entity that collects public record information for consumer reporting agencies.

> ### 2. The FCRA-enforcing agencies' interpretation of "furnisher" is entitled to *Chevron* deference.

The FCRA itself, along with the statute's legislative history, make clear that the courts' and agencies' interpretation of "furnisher" is correct. Where, as here, the agencies charged by Congress with implementing the FCRA have permissibly interpreted "furnisher" — consistent with the courts' interpretation, the statute and the legislative history — the agencies' interpretation is entitled to Chevron-deference. *See Yonter*, 777 F. Supp. at 492 (deferring to the FTC's construction of the FCRA under *Chevron v. NRDC*, 467 U.S. 837, 843 (1984)). This deference is all the more appropriate here, because the rulemaking agencies are well aware of organizations such as LNRIAG, but continue to construe "furnisher" as applying only to entities who, unlike LNRIAG, have direct relationships with consumers. *See* FCRA Dispute Report at 10 (stating that consumer reporting agencies "often hire contractors to manually collect [public record] information"); *see also* 16 CFR 660.4(b)(1)(iv) (expressly exempting entities that supply public record information to credit bureaus and which do not have "an account or other relationship with the consumer" from regulations requiring "reasonable investigations" of

disputed information in a consumer report); 12 CFR parts 41, 222, 334, 571, and 717 at

§§ .43(b)(1)(iv) (same).

### 3.     Industry practice makes clear that LNRIAG is not a "furnisher."

Finally, in addition to the FCRA's legislative history and the courts' and agency

interpretation of the FCRA, industry practice makes clear that LNRIAG is not a

"furnisher" of information under the FCRA.  *See Owner-Operator Ind. Driver's Ass'n,*

*Inc. v. USIS Comm. Servs., Inc.*, 537 F.3d 1184, 1193 (10th Cir. 2008) (holding "*evidence*

*of industry practice* . . . relevant to the question of willful noncompliance with the

[FCRA].") (emphasis added); *see also Yonter*, 777 F. Supp. at 492 (assessing industry

practice in granting summary judgment in favor of defendants on FCRA claims).  As

Justice Frankfurter long ago observed, "The recognized practices of an industry give life

to the dead words of a statute dealing with it."  *United States v. Maher*, 307 U.S. 148, 155

(1939) (construing the Motor Carrier Act).

The credit reporting agencies did not treat LNRIAG as a "furnisher" of consumer

credit information under the FCRA.  (*See* Johnson Decl. ¶¶ 27-35; Centanni Decl. ¶ 13;

Fluellen Decl. ¶ 20-23; DeGrace Decl. ¶ 9; Stockdale Decl. ¶¶ 17-22.)  For example, the

credit bureaus did not provide LNRIAG with notices required to be provided to

information "furnishers" under the FCRA, such as a notice that a consumer disputes

information in a credit report due to an alleged identity theft.  (Johnson Decl. ¶ 35.)  The

credit bureaus also did not use, or ask that LNRIAG use, "e-OSCAR" — an automated

web-based clearinghouse for use by furnishers of information under the FCRA to process

disputes — when LNRIAG processes CDVs for the credit bureaus. (*Id.*; *see also* Centanni Decl. ¶ 13(c); Fluellen Decl. ¶ 23; Stockdale Decl. ¶ 20); 15 U.S.C. § 1681i(a)(5)(D) (requiring consumer reporting agencies to implement an automated reinvestigation system through which furnishers of information may report the results of reinvestigations). The reason why not is obvious — LNRIAG was merely a vendor hired by the credit bureaus to gather public record information that the credit bureaus would otherwise have had to gather for themselves. The FCRA's notice and dispute processing provisions only apply — and indeed only make sense — where the entity in question is reporting on an experience or relationship it has with the consumer.

Moreover, unlike entities that investigate disputes as to the accuracy of information regarding their own transactions with consumers, LNRIAG was compensated for its verifications of CDVs. (Johnson Decl. ¶ 33.) The credit bureaus do not compensate credit card, mortgage or auto loan lenders required to investigate consumer disputes regarding account information supplied by such lenders. (*See* Centanni Decl. ¶ 13(b); Fluellen Decl. ¶ 22; Stockdale Decl. ¶ 19.)

In addition, the credit bureaus regularly directed to LNRIAG CDV requests with respect to public record information that was not originally provided by LNRIAG to the consumer reporting agency. (Johnson Decl. ¶ 31; Stockdale Decl. ¶ 18.) The FCRA requires CRAs, on receipt of a dispute from a consumer, to "conduct a reasonable reinvestigation to determine the whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item" within 30 days from receipt of notice of the dispute. *See* 15 U.S.C. § 1681i(a)(1)(A). Additionally,

within five days of receiving notice of a dispute, the CRA must notify the furnisher of the

dispute.  *Id.* § 1681i(a)(2)(A).  Where the CRAs receive a dispute about an account with a

particular lender, the CRAs refer that dispute to the lender from which they obtained the

disputed information.  (Fluellen Decl. ¶ 21; Centanni Decl. ¶¶ 11-13; Stockdale Decl.

¶ 18.)  The lender is clearly the "furnisher" of the information as that term is used in the

FCRA.  The fact that the CRAs did not, on receipt of public records disputes, research the

original source of the disputed public record and direct the dispute to that vendor

demonstrates that the CRAs do not view public records data vendors as "furnishers" to

which they must refer reinvestigation requests under Section  1681i(a)(2)(A).

The industry's practice of not considering LNRIAG a "furnisher" pursuant to the

FCRA, when combined with the courts' and federal agencies' interpretations (not to

mention common sense) further demonstrates that LNRIAG's motion for summary

judgment should be granted.  *See Owner-Operator Ind. Driver's Ass'n*, 537 F.3d at 1193

(evidence of industry practice relevant in applying the FCRA); *see also Yonter,* 777 F.

Supp. at 492 (referring to "longstanding agency interpretation, Congressional

acquiescence, widespread industry practice and, as the defendant respectfully asserts in

his brief, 'common sense'" in granting defendants summary judgment on FCRA claims).

## CONCLUSION

Plaintiff's claim should be resolved in LNRIAG's favor as a matter of law.  The

FCRA, the conclusions of the rulemaking bodies empowered by Congress to implement

the FCRA, extensive legislative history, numerous courts, and industry practice all make

clear that FCRA "furnishers" are limited to persons who convey information "relating to

consumers" — and more specifically information about that person's transactions or experiences with a consumer — to a consumer reporting agency.  LNRIAG was merely a vendor hired by the credit bureaus to gather public record information that the credit bureaus would otherwise have had to gather for themselves.  As a result, LNRIAG conveyed only information "relating to" public records.  Furthermore, LNRIAG had no relationship of any kind with consumers and did not report to anyone information about its transactions or experiences with consumers:  it had no such transactions or experiences.  LNRIAG is thus not an FCRA "furnisher."  Since plaintiff's FCRA claim is predicated on the characterization of LNRIAG as a furnisher, LNRIAG is entitled to summary judgment on that claim.

Dated:  May 7, 2010.                         NILAN JOHNSON LEWIS PA

By: s/ Joseph G. Schmitt
    Joseph G. Schmitt          (Atty. Reg. No. 231447)
    Kari L. Hainey             (Atty. Reg. No. 311455)
    400 •One Financial Plaza
    120 South Sixth Street
    Minneapolis, Minnesota  55402
    Telephone:  612.305.7500
    Facsimile:  612.395.7501

James F. McCabe (*Pro Hac Vice*)
James R. McGuire (*Pro Hac Vice*)
Rebecca Snavely Saelao (*Pro Hac Vice*)
Adriano Hrvatin (*Pro Hac Vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone:  415.268.7000
Facsimile:  415.268.7522

Attorneys for Defendant LexisNexis Risk & Information Analytics Group Inc.

31