**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MARY MILLER,<br><br>          Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., *et al.*,<br><br>          Defendants. | Civil No.:  09-2728 (PJS/RLE)<br><br>**DECLARATION OF MARK JOHNSON IN SUPPORT OF LNRIAG'S MOTION FOR SUMMARY JUDGMENT** |

sf-2775502

I, Mark Johnson, declare as follows:

1.  I submit this declaration in support of defendant LexisNexis Risk & Information Analytics Group Inc.'s ("LNRIAG") motion for summary judgment in the above-captioned case. I have personal knowledge of the facts set forth herein and, if called upon to do so, could and would competently testify thereto.

**BACKGROUND**

2.  I have been employed in the public records collection business since 1995, when I commenced work with a company whose assets were later acquired by LNRIAG. LNRIAG was located at 1900 Northwest Expressway, Suite 1600, Oklahoma City, Oklahoma 73118. My official title was Vice President, Data Services, and I managed LNRIAG's public records collection division through January 1, 2010. The information set forth below relates to LNRIAG's public records collection division. As of January 1, 2010, LexisNexis Risk Data Retrieval Services LLC ("LNRDRS") operates the public records collection business formerly operated by LNRIAG. My current title is Vice President, Data Services at LNRDRS.

3.  My job responsibilities at LNRIAG involved virtually every aspect of the operations of LNRIAG's public records collection division, from managing the groups that performed the day-to-day operations of the public records collection division, to supervising systems and infrastructure, to managing the negotiation of contracts with LNRIAG's various contractors, vendors and customers. As a result of my work, I am knowledgeable about LNRIAG's business activities as they related to public records collection.

4.  LNRIAG's public records collection division was a public records vendor that gathered select information about certain public records, such as bankruptcy filings, civil judgments and tax liens, and, pursuant to contract, provided that information in bulk to LNRIAG's customers (or "subscribers" to LNRIAG's services). Those subscribers

included Trans Union, LLC ("Trans Union"), Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc ("Experian") (collectively the "credit bureaus"). LNRIAG's public records collection division also (again, by contract) performed on-demand public record information and document retrieval for the credit bureaus as part of a "consumer dispute verification" or "CDV" process.

5. As part of the CDV process, the credit bureau provided LNRIAG identifying information about a disputed record, such as the court, case number and file type. LNRIAG then collected current information about the public record from the appropriate court or government office, and transmitted the information about the public record's current status to the credit bureau.

6. In processing CDVs and transmitting bulk abstracts of public records data to its subscribers, LNRIAG did not attempt to relate or match a public record to a specific individual and made no representation to its subscribers that a public record may relate to any individual. LNRIAG did not associate with any public record any sort of identifier intended to indicate to which specific consumer a public record may relate. LNRIAG did not make or reflect any conclusion that different case proceedings may relate to the same person.

**LNRIAG'S BULK PUBLIC RECORDS COLLECTION BUSINESS**

7. LNRIAG's bulk public record information collection services consisted of accessing records such as federal, state and local tax liens and civil judgments from courts, county clerk offices and the like, copying certain information from those records, and then upon request transmitting the information about the records in bulk data sets, organized by collection source, to LNRIAG's subscribers.

8. Courthouses and clerks' offices across the country make public records available in different formats, by different means, and at differing time intervals from various public access points.

-3-

9. To collect information about public records, LNRIAG contracted with over 500 independent contractors ("ICs"). The ICs were provided with laptop computers loaded with proprietary LNRIAG software. The ICs accessed court records via public access points in public offices or on-line. At each source of public records information, the ICs keyed into their laptops selected information from those public records that had become available since the last time records were collected from that source. The proprietary software enforced quality control business rules and standardized the keyed information. The ICs periodically sent the public record data stored on their laptops to LNRIAG, where the data was processed further and added to LNRIAG's production database.

10. For some sources of public records information, LNRIAG used automated electronic processes to copy data from electronically-available public records, for example bankruptcy records available on Public Access to Court Electronic Records ("PACER") dockets.

11. The ICs were required to collect various pieces of information about newly available public records. The standardized data collected generally consists of:

- the originating court or office (e.g., Suffolk County, New York, County Clerk);
- the case or proceeding number;
- the record type (e.g., civil judgment; satisfaction of judgment);
- the date of the record;
- the names shown in the public record as associated with the proceeding (e.g., the plaintiff and the defendant; the tax authority and the taxpayer on a tax lien; the attorney on a bankruptcy petition);
- if applicable, the dollar amount of the obligation; and
- if available, the address(es) shown in the public record for the defendant.

12. LNRIAG formatted the collected data according to its subscriber's specifications, and transmitted the data to those subscribers at contractually specified intervals.

13. In transmitting to its' subscribers bulk abstracts of public records data, LNRIAG made no representation to its subscribers as to the identity of any individual to whom a public record may relate. LNRIAG provided its subscribers with select information about public record cases, not information about specific people. Indeed, LNRIAG's public records collections system was not able to fulfill public record information for specific individuals. LNRIAG's system could not provide, for example, for "all public records relating to John Q. Smith, residing at 123 Main St., Anytown, MN." I am aware that, in many cases, LNRIAG's credit bureau subscribers "match" the public record data that LNRIAG supplied with particular consumers. Such "matching" determinations were made by the credit bureaus alone, using their proprietary matching algorithms as applied not only to the information about the public record, but also to other information that the credit bureau had already associated with particular consumers, such as consumer address history, as well as lists of name variants that the bureaus have, over time, developed with respect to specific individuals. LNRIAG had no access to the credit bureaus' consumer address histories, name variant lists, or proprietary "matching" algorithms and was not involved in the "matching" process to any extent.

14. For its part, LNRIAG did not associate with any public record any sort of identifier intended to indicate to which specific consumer a public record may relate. LNRIAG did not make or reflect any conclusion that different case proceedings may relate to the same person.

15. LNRIAG's public records collection business was merely a pass-through, gathering public records information from public access sources (as required by each individual contract with LNRIAG's subscribers), applying quality controls and standardization to make it useable by the subscribers, and transmitting that information to

the subscribers. The subscribers could have, as they have done in the past, sent their own employees (or contractors) to each source that LNRIAG visits and collect the select public records information themselves. LNRIAG's subscribers chose not to do so because contracting with LNRIAG for this service was less expensive and more efficient for the subscribers than collecting the public records information themselves.

**LNRIAG'S ON-DEMAND VERIFICATIONS FOR THE CREDIT BUREAUS**

16. Pursuant to contracts between the credit bureaus and LNRIAG, LNRIAG performed on-demand verifications of public record content for the credit bureaus as part of a "consumer dispute verification" or "CDV" process.

17. Credit bureaus initiates CDVs after a consumer initiates a dispute as to the accuracy of a consumer report that the credit bureau has assembled about the consumer. The only types of CDVs that the credit bureaus sent to LNRIAG were those concerning public record information that the credit bureau had included in the consumer file of the complaining consumer. Since LNRIAG was not the sole source of public record data for credit bureaus, the public record information at issue in any CDV may or may not have originally been collected and transmitted to the credit bureau by LNRIAG. Whether LNRIAG originally transmitted the public record information or not, LNRIAG would perform the CDV if requested by a credit bureau and in conformity with LNRIAG's contractual obligations with that specific credit bureau.

18. Public record CDVs were generally transmitted to LNRIAG in bulk, in electronic format. In CDVs transmitted to LNRIAG, the credit bureaus provided LNRIAG with identifying information about the proceeding at issue such as the court, the case number and the party names. The credit bureaus also provided a "file type" code that indicates what kind of record has been reported. For example, "CJ" indicates that the record is a civil judgment. The credit bureaus also provided a numeric code that indicated the nature of the dispute (e.g., 1 -- consumer claims that the record is "Not Mine"), and the dollar amount associated with the record. LNRIAG's task, in processing

a public records CDV, was to "re-collect" (collect again) the selected information about the public record that it would have collected when the record first became available, and, where intervening events had changed the status of the debt (e.g., subsequent satisfaction of a civil judgment), to report that change.

19. Under the contracts between LNRIAG and the credit bureaus, the credit bureaus could choose one of several different levels of service from LNRIAG, each of which had its own price.  For a basic CDV, LNRIAG recollected records by physically visiting courts, by using official court web sites, or by contacting court personnel via phone or fax.  CDV responses were then reported back electronically to the credit bureau.  If the credit bureau wanted LNRIAG to retrieve a document (such as the civil judgment in question), it could select that option when it transmitted the CDV request.  LNRIAG charged a higher fee for document retrieval, as well as any court copying fees.

20. For each CDV, LNRIAG assigned an IC or, in rare cases, an employee to handle the re-collection of information about the record in question.

21. For each CDV, the IC identified the proceeding using the court and case number supplied by the credit bureau, and searched electronically for a filing of the type specified by the credit bureau at or near the date provided by the credit bureau.  If the IC could not locate the record identified as the subject of the CDV, the IC coded the CDV response as "unable to verify."  If the IC could locate the record, the IC proceeded as described below.

22. After review of the record in question, the IC keyed into the laptop current select information about the public record that was available electronically from the originating jurisdiction.  That information may differ from the information supplied by the credit bureau in the CDV.  For example, if the credit bureau supplied the name "James A. Johnson" (the name of the consumer disputing the record), but the electronic court records showed the judgment debtor as "James A. Johnston," the IC would rekey the name "James A. Johnston."  If there was an address found in the electronically

-6-

available public record, the IC rekeyed that address in the CDV response. If there was a status change with the record — e.g., a judgment had been satisfied or vacated; a tax lien had been released — the IC reported the changed current status in the CDV response.

23. Before the IC could close out the CDV response, LNRIAG's proprietary public records collection software displayed a pop-up box and required that the IC select from one of a number of response codes. The drop down menu offered choices such as "802 – Unable to Verify"; "803 – Status Not Changed" and "805 – Status Changed." Depending on the response selected, the IC may then be prompted to input further information. For example, if "803 – Status Not Changed," is selected, the contractor might then also specify "841 – No Release on File," if applicable. The response codes related to the specific public record specified in the CDV by the credit bureau, not to any record or filing that might be referred to in the "comments" or "consumer notes" section of the CDV. For example, a CDV might refer to a civil judgment, and the consumer notes might include a contention that the civil judgment had been satisfied. If the IC were to find the civil judgment, but not the satisfaction referred to by the consumer, the IC would use the response code "803 – Status Not Changed", referring to the civil judgment, rather than respond that the IC was unable to verify the document or event referred to in the consumer notes. LNRIAG's obligations under its contracts with the credit bureaus was to report information from public record sources.

24. LNRIAG and its contractors lacked the authority or ability to change any public record, or to change the contents of any consumer report prepared by a credit bureau. LNRIAG was not aware of the basis for why the credit bureau may have originally linked a public record to a consumer, and in the CDV process LNRIAG was not asked by the credit bureau to determine whether a record was properly matched to a consumer. LNRIAG and the contractors did not modify or delete anything in the actual public record — they only reported what the public record reflected consistent with the requirements of its contract with the credit bureau.

25. Approximately 60% of claims codes on CDV requests made by credit bureaus are "not mine" claims, meaning that the consumer disputes the credit bureau's conclusion that the information belongs to the consumer. In processing CDVs with "not mine" claims codes, LNRIAG did not provide to credit bureaus any advice as to whether or not the record in question is properly associated with the consumer in whose consumer report the credit bureau has placed the record. LNRIAG's role was limited to re-collecting information regarding the public record in question, and providing to the credit bureaus information that the credit bureau could use to reevaluate its "match" of the record with the complaining consumer. The credit bureaus did not request or expect, and LNRIAG did not perform, any analysis as to whether the record was properly associated with the consumer by the credit bureau.

26. On multiple occasions, the credit bureaus have each confirmed that they do not interpret LNRIAG's CDV responses as commentary on whether or not a public record is properly "matched" to a particular consumer. For example, during meetings with Experian in March 2009, Experian representatives expressly recognized that LNRIAG's return code on CDVs related only to the status of the case, not to the status of the defendant named in that case. In other words, following each CDV returned by LNRIAG, Experian made its own judgment about whether the disputed record is properly "matched" to the consumer. Experian understands that LNRIAG played no role in the "matching" process, either when the public record was first transmitted to Experian or following the CDV process.

**LNRIAG's PRACTICES AND COURSE OF DEALING WITH THE CREDIT BUREAUS**

27. LNRIAG conducted no transactions and had no experience with individual consumers about whom credit bureaus had prepared consumer reports that included public record information. The public record information that LNRIAG transmitted to the credit bureaus in bulk did not relate in any way to LNRIAG's transactions or

experiences with any consumer. Neither LNRIAG nor its employees or ICs had any specific or first hand knowledge of the events underlying the information contained in the public records collected and transmitted by LNRIAG. Rather, LNRIAG simply collected and transmitted select information from publicly available court records.

28. Credit reporting agencies such as CSC, Trans Union, Equifax, and Experian did not provide LNRIAG notices or otherwise treat LNRIAG as either a "user" or "furnisher" of consumer credit information under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

29. For example, pursuant to 15 U.S.C. § 1681e(d)(1), consumer reporting agencies must provide notice to furnishers of information regarding their obligations under the FCRA, the acceptable content of which is set forth in 16 CFR 698, Appendix G. The consumer reporting agencies did not provide this notice to LNRIAG.

30. It is my understanding that as to true "furnishers" of information such as creditors, the credit reporting agencies contact the creditor that originally furnished information being disputed by a consumer to investigate any dispute about the information the creditor provided.

31. In the course of its interactions with its subscribers, by contrast, LNRIAG received CDV requests from credit bureaus with respect to both public records that LNRIAG originally collected and public records that LNRIAG did not originally collect.

32. Likewise, LNRIAG was not asked by the credit bureaus to process CDVs on all public records for which LNRIAG supplied the credit bureau the original information about that public record.

33. LNRIAG was paid by credit bureaus to process CDVs. My understanding is that the credit bureaus do not pay companies that have accounts with consumers to investigate disputes by the consumer as to the information about the account that has been reported by such companies to the credit bureaus, and has been included in credit reports.

sf-2775502

34. Under 15 U.S.C. § 1681i(a)(5)(D), the nationwide consumer reporting agencies were required to set up an automated reinvestigation system through which "furnishers of information" to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. The credit reporting industry's current web-based electronic dispute processing system is known as e-OSCAR ("Online Solution for Complete and Accurate Reporting"). The credit bureaus did not use e-OSCAR to convey investigation requests to LNRIAG (unlike mortgage lenders, with which the bureaus use e-OSCAR), and LNRIAG did not use e-OSCAR to transmit results of any CDV back to a credit bureau.

35. When a consumer reports to the credit bureaus that an item (most frequently a credit card account) reported in the consumer's credit report was opened by an unauthorized person in an identity theft, the credit bureaus are required to notify the "furnisher" of the item that the consumer claims she was the victim of identity theft. It is my understanding that where the item is a consumer account with the entity that provided the information, the credit bureaus provide notice of the identity theft claim to that entity. Where the item was a public record that LNRIAG had provided to the credit bureaus, the credit bureaus did not provide any such notice to LNRIAG.

**FCRA DISPUTE REPORT**

36. Attached hereto as Exhibit A is a true and correct copy of the "FCRA Dispute Report" cited in LNRIAG's motion for summary judgment (Fed. Trade Comm'n, Fed. Reserve Sys., Report to Congress on the Fair Credit Reporting Act Dispute Process (Aug. 2006)).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 7, 2010, at Oklahoma City, Oklahoma.

*[signature]*
Mark Johnson